PER CURIAM.
Pursuant to a negotiated agreement, the appellant, J.L.N., pleaded guilty to establishing a residence in violation of the residence restrictions set forth in the Community Notification Act (“the CNA”),[1] specifically a violation of § 15-20-26(b), Ala.Code 1975. The trial court sentenced him to six years in prison. The appellant did not file any postjudgment motions. *740 This appeal followed. We reverse and render a judgment for J.L.N.
The appellant was previously convicted of the second-degree rape of his girlfriend, L.N.P., who was 15 years old at the time of the crime.[2] The appellant was incarcerated for a time, and, after he was released on probation, L.N.P.’s mother and L.N.P. moved into his house. The appellant was indicted in this "case on a charge that he, an adult sex offender, had established a residence within 1,000 feet of the' property on which his former victim or any of his victim’s immediate family members resided. § 15-20-26(b). The appellant filed an unverified motion to dismiss the indictment, to' which he attached police statements from L.N.P. and her mother that indicated that L.N.P. and the appellant had L.N.P.’s mother’s permission to marry and that L.N.P. and her mother had moved into the appellant’s house. After a hearing was held, at which no additional evidence or testimony was presented and after the trial court denied the motion to dismiss, the appellant entered a negotiated guilty plea to the charge that he had established a residence in violation of the restrictions established by the CNA. He reserved his right to challenge the trial court’s denial of his motion to dismiss.
This is an unusual case, in which the parties agree that the appellant was previously convicted of second-degree rape for having consensual sexual relations with his then underage girlfriend, L.N.P. and that L.N.P. and her mother later moved into the appellant’s residence. L.N.P. gave a statement to the police in which she stated that she and the appellant were engaged to be married and that her mother had granted L.N.P. permission to marry the appellant. L.N.P.’s mother gave a statement to the police in which she said that she knew that the appellant was a convicted sex offender when she and her daughter moved into his house because she had signed the warrant against him for the second-degree rape charge on which he was convicted. L.N.P.’s mother also stated that after she had signed the warrant she gave her daughter permission to marry the appellant. The State provided these statements to the appellant in response to a discovery request, and the appellant attached them to his motion to dismiss. The parties and the trial court referred to the substance of the statements at the hearing on the motion. At the conclusion of the hearing, the trial court stated, “I think the intent [of the CNA] was excellent, but I’m concerned that narrowly viewed cases like [the appellant’s], that it doesn’t take into consideration a lot of the things in cases like his. And therefore it is overly broad. But I want to look at this.” (R. 35.) The next day, the trial court entered an order summarily denying the motion to dismiss.
The indictment alleged that the appellant
“did, being an adult criminal sex offender convicted of Rape in the Second Degree, establish a residence or any other living accommodation within 1000 feet of the property on which his former victim [L.N.P.], or the victim’s immediate family members resided, in violation of Section 15-20-26(b) of the Code of Alabama, against the peace and dignity of the State of Alabama.”
(C. 18.) Section 15-20-26(b) provides:
“Unless otherwise exempted by law, no adult criminal sex offender shall estab *741 lish a residence or any other living accommodation within 1,000 feet of the property on which any of his or her former victims, or the victims’ immediate family members reside.”
The appellant argued in the trial court, as he does on appeal, that the CNA is unconstitutional because, he says, it is overbroad and vague and violates his procedural- and substantive-due-process rights.[3] Specifically, he contends that the CNA implicates the fundamental right to family integrity because it prevents certain people from marrying, prevents certain children from living with their parents, and prevents certain siblings and relatives from living in the same household. He further contends that the CNA violates his rights to procedural and substantive due process because, he says, it infringes upon the right to be free from physical restraint and punishment, the right to travel, the right to intimate association with family members, the right to marital privacy, and the right to contract and to pursue employment of one’s own choosing.
Initially, we must determine whether the appellant has standing to raise these constitutional challenges to the CNA.
“ ‘A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations. Broadrick v. Oklahoma, 413 U.S. 601, 610 [93 S.Ct. 2908, 2914, 37 L.Ed.2d 830] (and cases cited).’
“[Ulster County Court v. Allen,] 442 U.S. [140,] 154-55, 99 S.Ct. [2213,] 2223 [ (1979) ].”
Taylor v. State, 442 So.2d 128, 130-31 (Ala.Crim.App.1983). In State v. Woodruff, 460 So.2d 325, 327 (Ala.Crim.App.1984), we addressed the question' whether the trial court properly addressed Wood-ruffs claim that § 13A-6-65(a)(3), Ala. Code 1975, was unconstitutional because, Woodruff alleged, it violated “the right of privacy of consenting adults to engage in deviate sexual intercourse.” In finding that the trial court did not properly address the claim, we held:
“In reviewing the propriety of the trial court’s holding that the sexual misconduct statute is unconstitutional on its face, our threshold consideration is whether the trial court'properly disregarded the following prudential rule of judicial self-restraint in allowing Wood-ruff to raise the question of the facial invalidity of the statute as applied to others:
“ ‘[0]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.... ’
“United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).
“This court, as well as óur Supreme Court, has previously recognized and applied this traditional rule of standing. *742 For example, in Bland v. State, 395 So.2d 164, 166 (Ala.Crim.App.1981), we cited County Court of Ulster County v. Allen, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), for the following general proposition: ‘A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights; as a general rule, if there is no constitutional defect in the application of a statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.’ In State v. Wilkerson, 54 Ala.App. 104, 305 So.2d 378, 380, cert. denied, 293 Ala. 774, 305 So.2d 382 (1974), in finding that the appellant could not challenge the constitutionality of a statute because he could not show that the statute’s unconstitutional feature adversely affected him, we cited the general rule, as follows:
“ ‘ . in criminal prosecution, accused has the right to assert the invalidity of the law, regulation, or rule under which he is being prosecuted, but he must show that his rights are adversely affected by the statute or ordinance, and, more particularly, that his rights are thus affected by the particular feature of the statute alleged to be in conflict with the constitution. It is not sufficient that the statute may impair the rights of others. An accused affected by one portion of a statute may not plead the invalidity of another portion of the same statute not applicable to his case, where the invalidity of the portion questioned will not render void the entire act or at least some provision that does affect him adversely; but, conversely, he may do so where the invalidity of the portion questioned would render the entire act, or some provision affecting him, void ....’” (quoting 16 C.J.S. Constitutional Law § 84).
“Appellate courts will not pass upon a constitutional question unless some specific right of the appellant is directly involved; the appellant must belong to that class affected by the statute’s provisions. McCord v. Stephens, 295 Ala. 162, 325 So.2d 155 (1975); Evans v. State, 338 So.2d 1033 (Ala.Crim.App. 1976), cert. denied, 348 So.2d 784 (Ala.1977); Bozeman v. State, 7 Ala.App. 151, 61 So. 604, cert. denied, 183 Ala. 91, 63 So. 201 (1913). Even under the circumstances where a constitutional attack on a statute may be presented to the trial court prior to trial and, consequently, without benefit of a trial record, adherence to the traditional concepts of standing is required. See, e.g., State v. Friedkin, 244 Ala. 494, 14 So.2d 363 (1943); State v. Wilkerson, supra; People v. Allen, 657 P.2d 447 (Colo.1983); State v. Raybon, 242 Ga. 858, 252 S.E.2d 417 (1979); State v. Price, 237 N.W.2d 813 (Iowa 1976), appeal dismissed, 426 U.S. 916, 96 S.Ct. 2619, 49 L.Ed.2d 370 (1976); People v. Jose L., 99 Misc.2d 922, 417 N.Y.S.2d 655 (N.Y.Crim.Ct.1979); Commonwealth v. Bonadio, 490 Pa. 91, 415 A.2d 47 (1980); Commonwealth v. Hughes, 468 Pa. 502, 364 A.2d 306 (1976)....
[[Image here]]
“... [T]he question of a statute’s validity can not be determined abstractly, but rather should be determined only as it applies and is to be enforced in the specific case before the court. Because Woodruff did not claim or argue that his right to privacy has been violated by the statute’s application to him, he has not met his burden of demonstrating that the statute is unconstitutional as applied to him. The transcript is totally devoid of evidence indicating that Woodruffs *743 right to privacy was violated; the trial court declared the statute unconstitutional after a brief oral argument and without benefit of any evidence. Moreover, the complaint, charging Woodruff in the general statutory language, offers no indication of the factual setting in which the violation occurred.
“On this record, the trial court should have refrained from determining the statute’s constitutionality; furthermore, we will not express any opinion as to whether the ‘penumbrál’ right to privacy, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), should be extended to protect the freedom to indulge in sexual practices which have long been prohibited by our laws. ‘Where the question of the constitutionality of a statute is distinctly presented, and is necessary to the decision of the particular case, the courts do not hesitate to decide the question,’ Bray v. State, 140 Ala. 172, 37 So. 250, 251-252 (1904), but resolution of a constitutional question should not be predicated on supposition or speculation of the fácts. Whitten v. City of Atmore, 278 Ala. 70, 175 So.2d 764, 766 (1965). We are bound by the principles espoused by the Supreme Court of Alabama in State v. Montgomery, 177 Ala. 212, 59 So. 294, 296 (1912):
“‘It is the established rule of this court to decline to pass upon the constitutional validity of legislative enactments, unless the determination of the questions and rights then before it requires their decision. Smith v. Speed, 50 Ala. 276 [ (1874) ]; Bray v. State, 140 Ala. 172, 179, 37 South. 250 [1904]; Hill v. Tarver, 130 Ala. 592, 30 South. 499 [1901].... [T]his court will not decide any constitutional question respecting the validity of legislation, unless its decision thereupon is “indispensable” [to] the determination of that litigation. Wisdom and a just respect for the Legislature suggest and approve these rules.’
[[Image here]]
“Because the question of the constitutionality of § 13A-6-65(a)(3) comes before this court without the benefit of ‘concrete adverseness which sharpens the presentation of issues - upon which the court so largely depends for illumination of difficult constitutional questions,’ Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), we decline to pass upon this ‘ill-defined controversy.’ See People v. Rice, 41 N.Y.2d 1018, 395 N.Y.S.2d 626, 363 N.E.2d 1371 (1977); Commonwealth v. Cook, 468 Pa. 249, 361 A.2d 274 (1976). Because Woodruff has not shown himself to be entitled to raise the question, this court will ‘leave the question of constitutional power to be passed upon when a case arises which cannot be otherwise disposed of, and which, consequently, renders a decision upon such question necessary.’ Speed v. Smith, 50 Ala. 276, 283 (1874), quoting Cooley on Cons.Lim. 163. It is our duty to sustain legislative acts unless we are convinced beyond a reasonable doubt of their unconstitutionality. Ex parte McCurley, 390 So.2d 25 (Ala.1980). This case is infested with grave doubt concerning any unconstitutional application of § 13A-6-65(a)(3) to Woodruff; therefore, we leave this delicate constitutional issue for the proper case.”
Woodruff, 460 So.2d at 327-31 (footnotes omitted).
As noted, the appellant argues that the CNA prevents certain children from living with their parents; prevents certain siblings and relatives from living in the same household; infringes upon the right to be free from physical restraint and pun *744 ishment; infringes on the right to travel; infringes on the right to intimate association with family members; infringes on the right to marital privacy; and infringes on the right to contract and to pursue employment of one’s own choosing. However, he has not alleged that his rights in this respect have been violated by the provisions of the CNA. At most, the appellant argues that some provisions of the CNA, when applied to him, may violate some of those rights in the future. Therefore, he does not have standing to challenge the CNA based on a possible deprivation of those rights.
The appellant also argues that the CNA is unconstitutional because, he says, it is overbroad.[4] He contends that, because he is challenging the statute as over-broad, he can raise the above-referenced challenges to the CNA even though he has not established that he has standing to raise them.
“It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable. See, e.g., City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798-799, and n. 15 (1984); Board of Airport Comm’rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987). This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court. See, e.g., New York v. Ferber, 458 U.S. 747, 772 (1982); Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503 (1985). Thus, the Court has permitted a party to challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, see Thornhill v. Alabama, 310 U.S. 88, 97 (1940); Freedman v. Maryland, 380 U.S. 51, 56 (1965); Taxpayers for Vincent, 466 U.S., at 798, n. 15 and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected, see Broadrick v. Oklahoma, 413 U.S. 601 (1973); Jews for Jesus, 482 U.S., at 574-575.”
Forsyth County, Georgia v. Nationalist Movement, 505 U.S. 123, 129-30, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (emphasis added).
“ ‘ “The overbreadth doctrine derives from the First Amendment, see Young v. American Mini Theatres, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), and serves to invalidate legislation so sweeping that, along with its allowable proscriptions, it also restricts constitutionally-protected rights of free speech, press, or assembly, see e.g., Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). Since there are no First Amendment rights at stake here, the *745 overbreadth doctrine does not apply.” ’
“[McCall v. State, 565 So.2d 1163, 1165 (Ala.Crim.App.1990) ] (quoting McCrary v. State, 429 So.2d 1121, 1123-24 (Ala.Cr.App.1982), cert. denied, 464 U.S. 913, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983)).”
Elston v. State, 687 So.2d 1239, 1244 (Ala.Crim.App.1996) (emphasis added). Furthermore,
“the ‘chilling effect’ exception, which has been traditionally called ‘overbreadth,’ has consistently been applied only to claims that a statute tends to ‘chill’ the constitutional free speech or expression rights of others in violation of the first amendment; the United States Supreme Court has limited this exception to traditional free speech cases. United States v. Lemons, 697 F.2d [832,] 835 [(8th Cir.1983) ], and cases cited therein.”
Woodruff, 460 So.2d at 329. See also City of Montgomery v. Norman, 816 So.2d 72 (Ala.Crim.App.1999); Culbreath v. State, 667 So.2d 156 (Ala.Crim.App.1995), abrogated on other grounds by Hayes v. State, 717 So.2d 30 (Ala.Crim.App.1997); McCall v. State, 565 So.2d 1163 (Ala.Crim.App.1990); McCrary v. State, 429 So.2d 1121 (Ala.Crim.App.1982); Los Angeles Police Dep’t v. United Reporting Publ’g Corp., 528 U.S. 32, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999) (discussing the applicability of the overbreadth doctrine to expressive activity protected by the First Amendment); Forsyth County, Georgia v. Nationalist Movement, supra (same); 16 Am.Jur.2d Constitutional Law § 140 (1998); 16A Am.Jur.2d Constitutional Law § 411-414 (1998); and R. Rotunda & J. Nowak, Treatise on Constitutional Law § 20.8 (3d ed.1999).
The appellant has not alleged or shown that the CNA implicates his rights to freedom of speech or expression. Therefore, the overbreadth exception to the traditional rules of standing does not apply in this case.
However, we agree with the appellant that he has standing to raise the specific claim that the CNA unconstitutionally impinges on his right to marry. It appears from our examination of the transcript of the hearing on the appellant’s motion to dismiss that at no time during that hearing did the prosecutor object to the evidence relied on by the appellant to underpin his constitutional challenge to the CNA.[5] To the contrary, it appears that *746 both the prosecutor and defense counsel addressed their arguments to the trial court with the mutual understanding that there was a limited, core set of facts (based on the statements given by L.N.P. and her mother to the police) that governed the issues. The prosecutor’s argument at the hearing, with respect to the issue whether the CNA unconstitutionally impinged on the appellant’s right to marry, was not that the appellant’s constitutional challenge must fail for lack of evidentiary support, but, rather, that the statements attached to the motion to dismiss indicated a lack of standing because the statements did not reflect that the appellant and L.N.P. had taken affirmative steps to marry and had been denied that right based on the CNA, before they decided to live together in clear violation of the CNA. In fact, it is this aspect of the standing issue that forms the basis for the State’s argument on appeal. The State sums up this argument in its supplemental brief to this Court as follows: “An adult criminal sex offender simply does not have a constitutional right to cohabitate with unrelated, under-aged girls, without the benefit of marriage.” (State’s supplemental brief at p. 14.)
We conclude, however, that the statements given by L.N.P. and her mother indicate that the appellant and L.N.P. had taken specific steps toward marriage— they had sought and obtained permission from L.N.P.’s mother for L.N.P. to marry and they had become engaged.[6] It was, of course, the appellant’s decision to allow L.N.P. and her mother to establish a residence with him that resulted in the appellant’s indictment and conviction under § 15-20-26(b), Ala.Code 1975. Whether the appellant has any constitutionally protected right to live with L.N.P. outside of marriage begs the real issue presented here — whether the CNA interferes directly with his right to marry. Because the record suggests that his desire to marry L.N.P. formed at least part of the reason for the appellant’s decision to violate the CNA by bringing L.N.P. into his house and because the appellant is not permitted to come within 100 feet of L.N.P. without violating the CNA, we must disagree with the State’s contention that the statements of L.N.P. and her mother do not create a justiciable controversy because neither L.N.P.’s nor her mother’s statement alleged that the appellant and L.N.P. had attempted to marry and that their attempt to marry had been thwarted.
Although resolution of this standing issue certainly would be much easier if the statements indicated that the appellant and L.N.P. had attempted to marry and had been' prevented from doing so, we do not find that omission to be fatal to the appellant’s standing to challenge the constitutionality of the CNA on the basis that it infringes on his right to marry. Put simply, any statutorily proscribed interaction between the appellant and L.N.P. with the purported goal of marriage in mind could have resulted in the appellant’s being prosecuted under the CNA. It seems unreasonable to deny standing, as the State and the special writing suggest, on the ground that the record does not affirmatively show that the appellant actually married L.N.P. or that he attempted to marry her but was prevented from doing *747 so. Any such action on the appellant’s part would have constituted a violation of the CNA’s 100-foot restriction. See § 15-20 — 26(d), Ala.Code 1975. The State takes the position, however, that the appellant was not prosecuted under that section. The State argues that he was convicted under § 15-20-26(b) and that that section does not interfere with the appellant’s right to marry L.N.P. because, the State says, the appellant’s right to marry L.N.P. is in no way contingent on the two of them residing within 1,000 feet of each other. We suppose this may be correct in theory; however, from a commonsense standpoint, we find the State’s argument unrealistic and unpersuasive. As a practical matter, § 15 — 20—26(b) stands squarely between the appellant and his constitutional right to marry L.N.P. We conclude, therefore, that the CNA has an adverse impact on the appellant sufficient to support his standing to raise the constitutional challenge.
Freedom to marry appears to enjoy independent protection under both the First Amendment and the Due Process Clause of the Fourteenth Amendment. In Parks v. City of Warner Robins, 43 F.3d 609, 613-16 (11th Cir.1995), the United States Court of Appeals for the Eleventh Circuit surveyed this area of the law. It stated:
“That the right to marry is a fundamental right protected by the substantive component of the Due Process Clause of the Fourteenth Amendment is well established. See, e.g., Planned Parenthood v. Casey, [505] U.S. [833], [848-49], 112 S.Ct. 2791, 2805, 120 L.Ed.2d 674 (1992); Zablocki v. Redhail, 434 U.S. 374, 383-85, 98 S.Ct. 673, 679-81, 54 L.Ed.2d 618 (1978); Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967); McCabe v. Sharrett, 12 F.3d 1558, 1562 (11th Cir.1994).
“Nevertheless, the Supreme Court has held that not every statute ‘which relates in any way to the incidents of or prerequisites for marriage’ must be subjected to strict scrutiny. Zablocki, 434 U.S. at 386, 98 S.Ct. at 681. ‘To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed.’ Id. (emphasis added [in Parks ]). Therefore, whether, we examine this ordinance under strict scrutiny or rational basis analysis depends upon whether the statute ‘significantly interfere^’ with the decision to marry.
“A statutory classification must interfere ‘directly and substantially’ with the right to marry before it violates the Due Process Clause. Zablocki, 434 U.S. at 387, 98 S.Ct. at 681. In Loving, the seminal case, the Court struck down as violative of the ‘freedom of choice to marry’ an anti-miscegenation statute that voided interracial marriages and made them punishable as felonies. Loving, 388 U.S. at 4, 12, 87 S.Ct. at 1819-20, 1824. The statute at issue in Loving also provided that residents of Virginia who left the state to enter into interracial marriages were subject to criminal punishment upon returning to Virginia. Id. at 4, 87 S.Ct. at 1819. Similarly, in Zabloeki, the Court ruled unconstitutional a state statute that required Wisconsin residents with child support obligations to obtain a court order before they could marry. Zablocki, 434 U.S. at 387, 390-91, 98 S.Ct. at 681, 683. Under the statute, courts could grant such permission only if the obligated parent could produce proof of support and could demonstrate that the children so supported were ‘ “not then and [were] not likely thereafter to become public charges.” ’ Id. at 375, 98 S.Ct. at 675. The statute voided marriages contracted in any jurisdiction without the required court order and subjected violators to *748 criminal punishment. The Supreme Court concluded that these statutes were impermissible direct restraints on the freedom to marry. Id. at 387, 390-91, 98 S.Ct. at 681, 683-84; Loving, 388 U.S. at 12, 87 S.Ct. at 1824.
“In holding that the statute in Zablocki violated the Due Process Clause, the Court noted that
“ ‘[s]ome of those in the affected class ... will never be able to obtain the necessary court order.... These persons are absolutely prevented from getting married. Many others, able in theory to satisfy the statute’s requirements, will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry.’
“Zablocki, 434 U.S. at 387, 98 S.Ct. at 681.
“In contrast to its ruling in Zablocki, the Court in the same term upheld a Social Security provision that terminated benefits to a secondary beneficiary if he or she married a person ineligible for Social Security benefits. Califano v. Jobst, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). As the Court explained in Zablocki,
“ ‘[t]he directness and substantiality of the interference with the freedom to marry distinguish the instant case from ... [Jobst ]. The Social Security provisions placed no direct legal obstacle in the path of persons desiring to get married, and ... there was no evidence that the laws significantly discouraged, let alone made “practically impossible,” any marriages.’
“Zablocki, 434 U.S. at 387 n. 12, 98 S.Ct. at 681 n. 12 (citation omitted).
[[Image here]]
“... The First Amendment contains no explicit right of association. Nonetheless, the Supreme Court ‘ha[s] long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.’ Roberts v. United States Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984).
“Included in this First Amendment right of association is the right to enter into certain intimate or private relationships, such as family relationships. See id. at 619, 104 S.Ct. at 3250 (naming marriage as an example of constitutionally protected intimate association). This is true even though the primary purpose of such intimate associations may not be expressive. See Board of Directors of Rotary Int’l v. Rotary Club, 481 U.S. 537, 545-50, 107 S.Ct. 1940, 1945-48, 95 L.Ed.2d 474 (1987) CWe have emphasized that the First Amendment protects those relationships, including family relationships, that presuppose “deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one’s life.” ’ (quoting Roberts, 468 U.S. at 619-20, 104 S.Ct. at 3250)); Cummings v. DeKalb County, 24 F.3d 1349, 1354 (11th Cir.1994) (recognizing that intimate association is protected by the First Amendment); Wilson v. Taylor, 733 F.2d 1539, 1544 (11th Cir.1984) (holding that dating is a type of association protected by the First Amendment).
“Although the right to marry enjoys independent protection under both the First Amendment and the Due Process Clause, the Supreme Court has held that the same analysis applies in each context. In Lyng v. International Union, *749 United Auto., Aerospace and Agric. Implement Workers, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), the Court extended the reasoning in Za-blocki to apply to claims involving First Amendment associational rights. Id. at 364-67, 108 S.Ct. at 1189-90. The Court examined a Food Stamp Act provision that denied increased food stamp benefits to families of striking workers. The Court held that the food stamp statute did not infringe upon the striking workers’ right to associate with their families because it did not ‘ “order” any individuals not to dine together; nor [did] it in any way “ ‘directly and substantially’ interfere with family living arrangements.” ’ Id. at 365-66, 108 S.Ct. at 1189 (quoting Lyng v. Castillo, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (quoting Zablocki, 434 U.S. at 387, 98 S.Ct. at 681)).”
(Footnote omitted.)
The Legislature’s primary goal in enacting the CNA, as expressed in § 15-20-20.1, Ala.Code 1975, was to assist law-enforcement agencies in their efforts to protect victims and the general public from potential harm by convicted sex offenders. This is unquestionably a proper exercise of this State’s police power. The last paragraph of § 15-20-20.1 provides:
“Therefore, the state policy is to assist local law enforcement agencies’ efforts to protect their communities by requiring criminal sex offenders to register, record their address of residence, to be photographed, fingerprinted, to authorize the release of necessary and relevant information about criminal sex offenders to the public, to mandate residency and employment restrictions upon criminal sex offenders, and to provide certain discretion to judges for application of these, requirements as provided in this article.”
(Emphasis added.)
However, the problem with the CNA, at least'in the context of this case, is that it contains no exemption — and’ no procedure by which' a convicted sex offender can petition the court for an exemption — from the restrictions imposed by the statute and the corresponding severe punitive consequences for noncompliance. In this respect, the CNA is arbitrarily broad, because its practical effect is to create a conclusive presumption that there are no circumstances under which it might be appropriate for a convicted sex offender to interact vdth his victim — a presumption belied by the particular facts of this case. Contrary to the Legislature’s reference in the last paragraph of § 15-20-20.1 to providing “certain discretion'to judges for application of these requirements,” the CNA provides no means for an individualized determination by a court in those rare instances, such as this one, where a convicted sex offender and his victim wish to marry. Such irrebuttable presumptions have long been disfavored under the Due Process Clause. See, e.g., Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 640, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). For these reasons, we conclude that the CNA interferes directly and substantially with the appellant’s right to marry.
Analyzing the particular facts of this case under the heightened-scrutiny standard set out in Parks, supra, we fail to see any compelling state interest that would be furthered by sustaining the appellant’s conviction and maintaining the currently impenetrable Wall of separation between L.N.P. and the appellant that thfe CNA erects. Child sexual abuse is a reality in far too many homes in Alabama and in our nation. The sheer number of cases in this Court involving the sexual abuse and ex *750 ploitation of children is a reflection of this widespread problem. The physical and mental damage inflicted on child victims of sex offenses is simply too difficult to even contemplate. Consequently, the public outcry for legislation to protect our children and the integrity of our communities is understandable, expected, and welcomed. Equally understandable is the Legislature’s desire to enact the CNA in an attempt to address these important concerns. However, the record before this Court indicates that the appellant was convicted in part as a result of his desire to marry L.N.P. The right to marry is a fundamental right that is protected by the United States Constitution. The disposi-tive issue in this case is whether the CNA’s blanket residency restriction must give way to the appellant’s constitutionally protected right to marry L.N.P. We hold that it must. In so holding, we emphasize that the moral implications of a marriage between the appellant and L.N.P. are outside the scope of judicial review.
For these reasons, we hold that the CNA is unconstitutional as applied to the facts of this case. The appellant’s conviction is, therefore, reversed, and a judgment is rendered for him.
REVERSED AND JUDGMENT RENDERED.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur.
BASCHAB, J., concurs in part and dissents in part, with opinion.

. Sections 15-20-20 through -37, Ala.Code 1975.

. See § 13A-6-62(a)(l), Ala.Code 1975, which states that "[a] person commits the crime of rape in the second degree if ... [b]eing 16 years old or older, he or she engages in sexual intercourse with a member of the opposite sex less than 16 and more than 12 years old; provided, however, the actor is at least two years older than the member of the opposite sex.”

. In addition to challenging § 15-20-26(b), Ala.Code 1975, under which he was indicted, the appellant also appears to argue that §§ 15-20-23, 15-20-25, and 15-20-26(a), (c), and (d), Ala.Code 1975, are unconstitutional. However, he was not charged with violating any of those provisions of the CNA. Therefore, he does not have standing to challenge those provisions, and we will not review his constitutional challenges regarding those provisions.

. The appellant asserts in his statement of issues that the statute is unconstitutional because it is vague. However, he does not set forth any argument in support of this issue, as required by Rule 28(a)(10), Ala.R.App.P. (formerly Rule 28(a)(5)). Therefore, we will not review this issue.

. We note, as Judge Baschab points out in her special writing, that the appellant's motion to dismiss was not verified and that the statements of L.N.P. and her mother were not in affidavit form. However, we do not deem this to be dispositive of the standing issue. In Ex parte Jefferson, 749 So.2d 406, 408 (Ala.1999), the Alabama Supreme Court stated:
“In Similton v. State, [612 So.2d 1363 (Ala.Crim.App.1995) ], the Court of Criminal Appeals held that assertions in an unverified motion are bare allegations and cannot be considered as evidence or proof of the facts alleged. However, in Hill v. State, 675 So.2d 484 (Ala.Crim.App.1995), the Court of Criminal Appeals modified its holding in Similton and reversed the trial court’s denial of a motion for new trial and remanded the case to the trial court because the allegations of ineffective assistance of counsel were supported by facts contained in the record on appeal. Supporting affidavits or other extrinsic evidence is not necessary where the grounds relied on in the motion for a new trial are shown by the record of the proceedings. Hill v. State, 675 So.2d 484 (Ala.Crim.App.1995).”
Although the procedural posture of this case is not identical to that in Jefferson, we believe that the legal principle stated in Jefferson is applicable here. The trial court was certainly aware of and understood the pertinent facts and the appellant’s legal assertions, and the prosecutor and the appellant did not disagree about those underlying facts. The State did not argue in the trial court that the appellant lacked standing because his motion and the statements of L.N.P. and her mother were unverified. Therefore, we believe that *746 the record was sufficient to establish the appellant's standing and that this Court should address the significant issue presented.

. Section 30-1-4, Ala.Code 1975, provides that a person 14 years of age or older is capable of contracting for marriage. Section 30-1-5, Ala.Code 1975, requires parental consent if the person intending to marry is under 18 years of age and has not had a former spouse.